UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re CISCO SYSTEMS INC. SECURITIES LITIGATION<br><br>This Document Relates To All Actions. | Case No: C 11-1568 SBA<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DIMISS FIRST AMENDED COMPLAINT WITH LEAVE TO AMEND**<br><br>Dkt. 65 |

This is a securities fraud class action brought under the Securities Exchange Act of 1934 ("Exchange Act") on behalf of all persons who purchased or otherwise acquired the common stock of Cisco Systems, Inc. ("Cisco" or "the Company") between February 3, 2010 and May 11, 2011 (the "Class Period"). The Consolidated Amended Complaint ("Amended Complaint"), the operative pleading before the Court, names three party-defendants: Cisco; John T. Chambers ("Chambers"), Cisco's Chairman and Chief Executive Officer; and Frank Calderoni ("Calderoni"), Cisco's Executive Vice-President and Chief Financial Officer.

The parties are presently before the Court on Defendants' Motion to Dismiss First Amended Complaint, which is brought pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 65. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS Defendants' motion and dismisses the Amended Complaint with leave to amend. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

## I.  **BACKGROUND**

Defendant Cisco is a publicly-traded corporation that designs, manufactures, and sells IP-based networking and other products and services related to the communications and IT industry.  Am. Compl. ¶¶ 2, 48, Dkt. 58.  Cisco's customer base presently is divided into the following segments:  enterprise (companies with more than 1,000 employees); commercial (companies with less than 1,000 employees); consumer; service provider; and public sector.  Id. ¶ 53.

From 2000 to 2008, Cisco embarked on a growth by acquisition strategy.  Id. ¶ 2.  In 2003, Cisco sought to diversify into the consumer business by acquiring Linksys, a manufacturer of home networking products, such as routers for home use.  Id. ¶ 55.  Cisco also acquired Scientific Atlanta, a manufacturer of cable set-top boxes and other products.  Id.  During Cisco's expansion phase, its net earnings grew from $18.9 billion in 2000 to $39.5 billion in 2008.  Id. ¶ 2.  The bulk of Cisco's revenues were generated from its core business of selling switches and routers.  Id. ¶¶ 2, 49.  To continue its growth, Cisco expanded into new markets, which entailed launching 85 new products in 2009 and 2010.  Id. ¶¶ 3, 8.

Cisco's fiscal year runs from August 1 through July 31.  Id. ¶ 2 n.1.  Following the end of every quarter, Cisco issues a press release and holds an earnings conference call with analysts to discuss the results of the previous quarter.  Plaintiffs allege that Cisco issued press releases and held conference calls with financial analysts on February 3, 2010, May 12, 2010, August 11, 2010, and November 10, 2010, during which Chambers and Calderoni allegedly made false and misleading statements.  Id. ¶¶ 66, 216, 232; Defs.' Request for Judicial Notice ("RJN"), Exs. K, L, M, R, S, T, Dkt. 66.  According to Plaintiffs, Defendants misled investors by representing that Cisco was successfully diversifying into new businesses while simultaneously increasing revenues and market share in its router and switching business.  Am. Compl. ¶ 5.  In reality, Plaintiffs claim, Defendants knew that revenues, gross margins and market share would decline based on a number of factors, such as increased competition, lower prices and margins on newly-launched products, and

declining demand for cable set-top boxes, home routers and other consumer products.  Id. ¶¶ 6-10.

Plaintiffs assert that Defendants' dissemination of misleading information and concealment of negative information during the 2010 conference calls and in the related press releases artificially inflated Cisco's stock price.  Id. ¶ 13.  Chambers allegedly sought to capitalize on Defendants' misleading statements by selling significant amounts of Cisco stock after each press release and conference call.  Specifically, on February 8 and March 5, 2010, Chambers sold 4 million stock shares for approximately $97 million.  Id. ¶ 333.  On May 17 and 18, 2010, he sold another 1,272,273 shares for approximately $31.3 million.  Id.  Finally, on August 18, 2010, Chambers sold 243,178 shares for approximately $5.5 million.  Id.  In sum, Chambers sold over $133 million in Cisco stock between February 8 and August 18, 2010.  Id.

By November 2010, it had become apparent that Cisco was facing challenges with its business strategy.  Specifically, on November 10, 2010, Cisco issued a press release and held a conference call during which Defendants disclosed disappointing results in the cable set-top box business, and in its public sector and consumer businesses.  Id. ¶¶ 10, 254.  On November 11, 2010, Cisco's stock price declined 16.2%.  Id. ¶ 15.  On February 10, 2011, Cisco's stock price declined another 14.2% after it disclosed additional problems in the set-top box, public sector and consumer businesses, an unexpected decline in switching sales, disappointing router sales and unexpected declines in gross margins and earnings.  Id.  On May 12, 2011, Cisco's stock price declined 4.8% after the Company disclosed additional problems in the switching, consumer and public sector businesses and a plan to reduce expenses by $1 billion through a reduction in force.  Id.

The declines in Cisco's stock price prompted various law firms to file shareholder derivative actions in this Court.[1]  The Court, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4(a)(3)(B), and upon

_____

[1] See Cinitto v. Bartz, No. 11-01734 SBA; Ziolkowski v. Cisco Sys., Inc., No 11-1782 SBA; Poulos v. Cisco Sys., Inc., No. C 11-1923 SBA.

stipulation of the parties, subsequently consolidated the actions and appointed New England Teamsters & Trucking Industry Pension Fund and The Council of the Borough of South Tyneside Acting in its Capacity as the Administering Authority of the Tyne and Wear Pension Fund (collectively "Plaintiffs") as the Lead Plaintiffs.  Dkt. 57.  Thereafter, Plaintiffs filed their Amended Complaint.  Dkt. 58.

The Amended Complaint is 124 pages and consists of 376 separate paragraphs. The largely discursive pleadings are loosely organized around the press releases and analyst conference calls in 2010.  In each section, Plaintiffs include a heading styled as "Reasons Why Defendants Knew or Were Deliberately Reckless in Not Knowing Their Statements Were Materially False and Misleading."  See Am. Compl. ¶¶ 79-215, 230-31, 267-284. The pleadings attribute over 100 statements to Defendants, though only a fraction of them are expressly alleged to be misleading.  See id. ¶¶ 66, 216-220, 222-225, 227-228, 232-237, 240, 242, 258-260, 263, 264, and 266.  Of those statements alleged to be misleading, most are set forth in lengthy block-quotes that often are several paragraphs long.  See id. ¶¶ 66, 216, 217, 219, 220, 222, 223, 227, 228, 232, 233, 236, 237, 240, 258, 259, 260, 263.  In addition, Plaintiffs do not explicitly match each allegedly misleading statement with the specific facts demonstrating that the statement was false when made.

In response to the Amended Complaint, Defendants filed a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. 65.  In support of their motion, Defendants also filed a Request for Judicial Notice, attached to which are the press releases and transcripts from the earnings conference calls at issue, among other documents.  Dkt. 66.  Plaintiffs timely filed an opposition to the motion and a response to the Request for Judicial Notice, and Defendants thereafter filed their reply briefs in support of their motion and Request for Judicial Notice.  Dkt. 77, 78.[2]

---

[2] The Court notes that the opposition brief filed by Plaintiffs do not directly address the numerous arguments presented in Defendants' motion to dismiss. Dkt. 77. Plaintiffs' unorthodox and confusing organization of their opposition has made it unnecessarily difficult for the Court to ascertain what response, if any, Plaintiffs have with respect to each of the arguments made by Defendants.

## II.    **LEGAL STANDARD**

Pleadings in federal court actions are governed by Federal Rule of Civil Procedure 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Rule 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  A complaint may be dismissed under Rule 12(b)(6) for failure to state a cognizable legal theory or insufficient facts to support a cognizable legal theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  The court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The complaint must afford the defendants with "fair notice" of the claims against them, and the grounds upon which the claims are based.  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  Where a complaint or claim is dismissed, "[l]eave to amend should be granted unless the district court determines that the pleading could not possibly be cured by the allegation of other facts."  Knappenberger v. City of Phoenix, 566 F.3d 936, 942 (9th Cir. 2009).

## III.    **PRELIMINARY ISSUES**

Before turning to the merits of Defendants' motion to dismiss, the Court first addresses the scope of the materials that may be considered in connection with the motion. "Although generally the scope of review on a motion to dismiss for failure to state a claim

1   is limited to the Complaint, a court may consider evidence on which the complaint

2   necessarily relies if: (1) the complaint refers to the document; (2) the document is central to

3   the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the

4   12(b)(6) motion."  Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010)

5   (internal quotations and citations omitted).

6       In the instant case, Plaintiffs state that they do not oppose Defendants' Request for

7   Judicial Notice as to most of the documents attached thereto, so long as they are not

8   considered for the truth of the facts asserted therein.  Pls.' Response to Defs.' Request for

9   Jud. Notice ("Pls.' Resp.") at 7, Dkt. 78.  However, Plaintiffs expressly oppose taking

10  judicial notice of Exhibits J, Q, Y and Z.  Plaintiffs do not oppose Exhibit X, but contend

11  that they should first be allowed to conduct discovery regarding such document.  The Court

12  addresses these objections, in turn.

13      **A.    EXHIBIT J AND Q**

14      Exhibit J is a transcript from Cisco's November 4, 2009 conference call, and Exhibit

15  Q is the press release Cisco issued on that date.  These exhibits are not referenced in the

16  Amended Complaint and they do not appear to be central to Plaintiffs' claims.  In addition,

17  the Court does not refer to either exhibit in its analysis of Defendants' motion to dismiss.

18  Therefore, the Court declines to take judicial notice of Exhibits J and Q.

19      **B.    EXHIBITS Y AND Z**

20      Exhibit Y is a copy of Cisco's statement of policy on securities trading and Exhibit

21  Z is a calendar showing Cisco's FY 2010 trading windows for corporate insiders.

22  Defendants argue that the Amended Complaint necessarily relies on these two documents

23  because Plaintiffs imply that "Mr. Chambers had unfettered discretion to sell his stock at

24  any time."  Defs.' Reply in Supp. of RJN at 3, Dkt. 81.  However, the Complaint does not

25  reference either document.  In addition, consideration of those documents is unnecessary

26  for purposes of rendering an informed decision on Defendants' motion to dismiss.

27  Accordingly, the Court declines to take judicial notice of Exhibits Y and Z.

28

**C.      EXHIBIT X**

Plaintiffs do not oppose consideration of Exhibit X, a copy of Chambers' 10b-5 plan, but contend that they should first be allowed to engage in discovery regarding such document.  Pls.' Resp. at 5-6.  The Amended Complaint references this document, see Am. Compl. ¶ 340, and Plaintiffs do not challenge the authenticity of the copy submitted by Defendants.  However, at this juncture, the exhibit does not appear to be central to Plaintiffs' claims.  Since the exhibit need not be considered in resolving Defendants' motion to dismiss, the Court declines to take judicial notice of Exhibit X and denies Plaintiffs' request for discovery as moot.

Accordingly, the Court grants Defendants' Request for Judicial Notice, except with respect to Exhibits J, Q, Y, Z and X.  The Court now addresses Defendants' specific challenges to the Amended Complaint.

**IV.    <u>DISCUSSION</u>**

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), in tandem with Rule 10b-5, prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c).  To state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must plead:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  <u>Stoneridge Inv. Partners, LLC v. Scientific-Atl. Inc.</u>, 552 U.S. 148, 157, (2008).

In addition to Rule 8(a), "[a]t the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA."  <u>Rubke v. Capitol Bancorp Ltd.</u>, 551 F.3d 1156, 1164 (9th Cir. 2009).  Rule 9(b) provides that "[i]n alleging averments of fraud or mistake, a party must state with particularity the circumstances fraud or mistake."  Fed. R. Civ. P. 9(b).  "[T]he PSLRA also requires a plaintiff to plead scienter with particularity:  a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted

with the required state of mind.'" Rubke, 551 F.3d at 1164 (quoting in part 15 U.S.C. § 78u-4(b)(2)).

To plead falsity under the PSLRA, "[a] securities fraud complaint must now 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" In re Daou Sys., Inc., 411 F.3d 1006, 1014 (9th Cir. 2005) (quoting in part 15 U.S.C. § 78u-4(b)(1)). "To adequately plead scienter, the complaint must now 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009) (quoting in part 15 U.S.C. § 78u-4(b)(2)). "If a plaintiff fails to plead the alleged misleading statements or omissions or the defendant's scienter with particularity, the complaint must be dismissed." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004) (citing 15 U.S.C. § 78u-4(b)(3)(A)).

In their motion, Defendants argue that the Amended Complaint must be dismissed in its entirety on the grounds that Plaintiffs have: (1) engaged in "puzzle pleading" and have otherwise failed to specify with particularity what statements are false and the reasons why they are false; (2) failed to plead sufficient facts to establish scienter; and (3) predicated their claims on non-actionable statements. Defendants also seek to dismiss Plaintiffs' second claim for relief under §20(a) for failure to establish an underlying securities violation.

## A.   SUFFICIENCY OF THE ALLEGATIONS

### 1.   Puzzle Pleading

In the securities fraud context, the term "puzzle pleading" refers to a pleading that requires a defendant and the court to "match up" the statements that form the basis of the plaintiff's claims with the reasons why those statements are misleading. E.g., In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1073-75 (N.D. Cal. 2001); Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000). In In re Splash, the

Court dismissed a 124-page securities fraud complaint on the grounds that it was impermissibly organized in a manner that rendered "it exceedingly difficult to discern precisely which statements are alleged to be misleading," such that it was "left . . . up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading." Id. at 1073-74. Such pleading style, the Court concluded, is inconsistent both with Rule 8(a), which requires "simple, concise and direct" allegations, as well as the PSLRA, which requires the pleader "to craft a complaint in such a way that a reader can, without undue effort, divine precisely which statements (or portions of statements) are alleged to be false or misleading, and the reason or reasons why each statement is false or misleading." Id. at 1075.[3]

In the instant case, Plaintiffs have engaged in precisely the type of puzzle pleading frowned upon by both the Ninth Circuit and this District. The 124-page Amended Complaint references over 100 statements, only some of which are alleged to be false or misleading. Of those allegedly false or misleading statements, it is not entirely clear which part of the statements form the basis of Plaintiffs' claims. Moreover, there is no meaningful effort by Plaintiffs to link these statements to any of the voluminous facts alleged throughout the Amended Complaint's 376 paragraphs, many of which are lengthy and repetitive. As the authority set forth above makes clear, it is Plaintiffs', not Defendants' burden, to identify the misleading statement and link each one to the facts that establish that the statement was false or misleading when made. In re GlenFed, 42 F.3d at 1553-54 ("A complaint is not a puzzle . . . and we are loathe to allow plaintiffs to tax defendants, against whom they have leveled very serious charges, with the burden of

---

[3] Other decisions by this Court are in accord. In re Calpine Corp. Sec. Litig., 288 F. Supp. 2d 1054, 1089 (N.D. Cal. 2003) ("Plaintiffs seem to believe that by throwing as many allegations at the Court and defendants as possible, one will somehow slip by the Court and 'stick.' This practice is utterly unacceptable, and Plaintiffs' refusal to subject their allegations and theories to serious scrutiny before inserting them in the [Second Amended Complaint] has wasted the Court's time."); McCasland v. FormFactor Inc., No. C 07-5545 SI, 2008 WL 2951275, *7 (N.D. Cal. July 25, 2008) (dismissing complaint finding that it "contravenes applicable pleading standards by juxtaposing the same series of generic conclusions against each set of block quotes, without differentiation or specificity.")

1  solving puzzles in addition to the burden of formulating an answer to their complaint.").

2  The Court therefore finds that the Amended Complaint violates Rule 8(a) and the PSLRA

3  and is subject to dismissal.

4             2.    **Falsity**

5             The Amended Complaint also fails to meet the heightened pleading requirements for

6  alleging falsity.  First, Plaintiffs neglect to "specify <u>each statement</u> alleged to have been

7  misleading."  <u>See</u> 15 U.S.C. § 78u-4(b)(1) (emphasis added).  As noted, only some of the

8  myriad of statements attributed to Defendants are expressly alleged to have been false or

9  misleading when made.  <u>See</u> Am. Compl. ¶¶ 66, 216-220, 222-225, 227-228, 232-237, 242,

10 258-260, 263, and 266.  Most of those particular statements are set forth in paragraphs

11 containing lengthy block-quotes without any specification as to whether Plaintiffs are

12 alleging that the entire or simply part of the statement is false or misleading.  This type of

13 ambiguous pleading contravenes the specificity requirement of the PSLRA.  <u>McCasland</u>,

14 2008 WL 2951275, *7 (finding that alleged misrepresentations alleged in the form of block

15 quotes did not comport with the PSLRA's specificity requirements); <u>Osher v. JNI Corp.</u>,

16 256 F. Supp. 2d 1144, 1155 (S.D. Cal. 2003) (finding that block quotes from defendant's

17 prospectus "failed to satisfy the PSLRA's requirement that they 'specify each statement

18 alleged to have been misleading'").[4]

19            Second, the pleadings do not clearly articulate "the reason or reasons why the

20 statement is misleading."  <u>See</u> 15 U.S.C. § 78u-4(b)(1).  Under the PSLRA, this

21 requirement is satisfied "by pointing to <u>inconsistent</u> contemporaneous statements or

22 information (such as internal reports) which were made by or available to the defendants."

23 <u>Yourish v. California Amplifier</u>, 191 F.3d 983, 996 (9th Cir. 1999) (internal quotations and

24 citation omitted, emphasis added).  Here, Plaintiffs allege that Defendants' statements

25 regarding Cisco's supposedly successful foray into new markets were misleading in light of

26 _____

27       [4] As for the remainder of the statements contained in the Amended Complaint,
   Plaintiffs do not specify whether they are alleged to be false or misleading.  In the absence
   of such an allegation, the Court presumes that Plaintiffs are not claiming that those
28 particular statements are actionable.

financial data showing that Cisco's revenues and market share for its switching and routing products actually declined over the next four quarters.  See Am. Compl. ¶¶ 80-90. Plaintiffs' reliance on such statistics is misplaced, as disappointing sales do not show that statements made by Defendants were false when made.  In re GlenFed, 42 F.3d at 1548 ("it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood.").

Plaintiffs also attempt to take Defendants to task for representing that Cisco was successfully entering "into 30+ new market adjacencies" and that the Company's expansion strategy was "working."  See Am. Compl. ¶¶ 216, 232.  According to Plaintiffs, that statement was false because Chambers "knew" that Cisco never previously launched 85 new products at once, that new products have lower margins which lead to lower revenues, and that it would take time to increase margins "to levels they wanted."  See id. ¶¶ 106, 230, 232, 244.  However, Plaintiffs fail to show that Defendants' purported awareness of risks and related financial consequences associated with launching new products is inconsistent with Cisco's claim that it was successfully entering into new markets.  In sum, the Court finds that the Amended Complaint is subject to dismissal for failure to plead falsity with the requisite particularity under the PSLRA.

### 3.    Scienter

Plaintiffs' failure to adequately plead falsity renders it unnecessary for the Court to consider the sufficiency of the allegations of scienter.  Karacand v. Edwards, 53 F. Supp. 2d 1236, 1252 (D. Utah 1999) ("Where, as here, plaintiffs have not adequately pleaded falsity, it is unnecessary to determine whether they have adequately pleaded scienter.  Where plaintiffs fail to plead falsity, a fortiori they have not established that defendants knew those statements were false.").  Nonetheless, for the reasons set forth below, the Court finds, as an alternative matter, that the Amended Complaint is subject to dismissal for failure to adequately plead scienter.

The PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u-4(b)(2).  The required state of mind is scienter, a mental state embracing intent to deceive, manipulate, or defraud.  <u>Tellabs</u>, 551 U.S. at 319.  A complaint must allege that the defendants made false or misleading statements either knowing they were false or with deliberate recklessness as to their falsity.  <u>Zucco Partners</u>, 552 F.3d at 991.  It is not enough for a plaintiff merely to allege facts "from which an inference of scienter rationally could be drawn."  <u>Tellabs</u>, 551 U.S. at 323.  Instead, the plaintiff must "plead with particularity facts that give rise to a '<u>strong</u>' – i.e., a powerful or cogent – inference." <u>Id.</u> (emphasis added).  In determining whether a plaintiff has met this heightened pleading burden, the Court must examine whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter.  <u>Id.</u> at 324.  The Court "must consider plausible, nonculpable explanations for the defendant's conduct," not only inferences favoring the plaintiff.  <u>Id.</u>  Ultimately, "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations."  <u>Id.</u>; <u>Zucco Partners</u>, 552 F.3d at 991.

The Amended Complaint sets forth four categories of allegations to demonstrate a strong inference of scienter:  (1) stock sales by Chambers; (2) statements and conduct occurring after Defendants' allegedly misleading or false statements were made; (3) Cisco's close relationship with its customers; and (4) internal Cisco statements and information, including information allegedly provided by confidential witnesses.  <u>See</u> Am. Compl. ¶ 6.

### a)    *Stock Sales*

Plaintiffs aver that insider stock trading by Chambers is sufficient to create a strong inference of scienter.  "Insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  <u>Ronconi v. Larkin</u>, 253 F.3d 423, 435 (9th Cir. 2001).  To evaluate the import of insider stock sales, courts consider, inter alia, three factors: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history."  <u>Nursing Home Pension Fund</u>, 380 F.3d at 1232.

1    Here, the Amended Complaint alleges that during the Class Period, Chambers sold
2   83% of his Cisco holdings, and that those transactions took place within a week of the
3   conference calls and press releases at issue, and shortly after Cisco repurchased 87 million
4   shares during 3Q10.  See Am. Compl. ¶¶ 231, 333-337.  Citing Chambers' SEC Form 4,
5   which documents his insider stock sales, Defendants contend that he sold only 22%, as
6   opposed to 83%, of his shares in Cisco.  See Defs.' Mot. at 13 n.5 (citing RJN Ex. BB).
7   However, the basis for Defendants' calculations is not readily apparent from this exhibit.
8   Defendants also suggest that the timing of Chambers' sales is inconsequential, since they
9   were permitted under his 10b-5 plan.  But, the mere fact that the sales were permitted does
10  not ipso facto mean that the timing of his decision to sell was unrelated to undisclosed
11  information or the statements made during the conference calls and in the press releases in
12  dispute.

13       The above notwithstanding, the timing of Chambers' trading activity in relation to
14  Cisco's stock repurchase is irrelevant to the analysis of the timing of Chambers' trades.
15  Cisco announced its stock repurchase program in 2001, and had been engaging in stock
16  repurchases for years before the Class Period.  See RJN Ex. B at 28, 61; Ex. C at 30, 64;
17  Ex. D at 30, 65; Ex. I at 35, 66; Ex. F at 25, 55; Ex. G at 28, 64.  Moreover, as this Court
18  has previously recognized, Cisco's long-standing stock repurchase program rebuts a finding
19  of scienter, since it is illogical that Cisco would have been repurchasing its shares had it
20  been aware of facts that would indicate the price would fall.  In re Tibco Software Sec.
21  Litig., No. C 05-2146 SBA, 2006 WL 1469654, *21 (N.D. Cal. May 25, 2006) (noting that
22  no Ninth Circuit or Northern District of California case supports the argument that a stock
23  repurchase program is relevant to a showing of scienter, and finding that such a program
24  actually helps negate a finding of scienter); see also In re NVIDIA Corp. Sec. Litig., No.
25  C 08-4260 RS, 2010 WL 4117561, *11 (N.D. Cal. Oct. 19, 2010) (finding that an inference
26  of scienter is undermined by facts showing that the defendant company "actually
27  repurchased shares during the Class Period").

28

Also problematic for Plaintiffs are their allegations regarding Chambers' activity during the Class Period compared with his prior trading activity. The Amended Complaint alleges that:

> Chambers' sales were also suspiciously and dramatically higher than his sales before the Class Period. The 5.5 million shares sold during the Class Period was more than 11 times the 500,000 shares he sold before the Class Period, and the $134 million of proceeds was almost 12 times the $11.4 million Chambers received from his pre-Class Period sales.

Am. Compl. ¶ 335. The mere fact that the volume of Chambers' trading activity during the Class Period was greater than before, standing alone, is uncompelling. It is axiomatic that Chambers' earlier trading activity was circumscribed by the number of stock shares he possessed and was permitted to trade. Since Plaintiffs provide none of that information, the Court is unable to assess whether Chambers' stock sales were "significant enough and uncharacteristic enough to cast doubt on [his] motives." Zucco Partners, 552 F.3d at 1006.

Even if Chambers' personal trading activity were sufficiently suspicious to raise a strong inference of scienter, the pleadings make no allegations that Calderoni, Cisco's Chief Financial Officer, or any other Cisco executive, engaged in any stock sales during the Class Period. The lack of such allegations negates any inference of scienter, notwithstanding Chambers' trading activity. Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1067 (9th Cir. 2008) ("We typically require . . . corroborative sales by other defendants—to allow insider trading to support scienter."); Ronconi, 253 F.3d at 436 ("One insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made.").

### b) *After-the-Fact Statements*

Plaintiffs allege that subsequent to the 2010 conference calls and press releases, Chambers "admitted" that his earlier statements were misleading. The PSLRA requires "particular allegations which strongly imply Defendants' contemporaneous knowledge that

the statement was false when made." <u>Berson v. Applied Signal Tech., Inc.</u>, 527 F.3d 982, 989 (9th Cir. 2008) (internal quotations, alterations and citation omitted). "A complaint can establish that a statement was false when made by alleging '[a] later statement by the defendant along the lines of "I knew it all along."'" <u>Yourish</u>, 191 F.3d at 996 (citing <u>In re GlenFed</u>, 42 F.3d at 1549 n.9). In other words, a "later statement may suggest that a defendant has a contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." <u>In re Read-Rite Corp. Sec. Litig.</u>, 335 F.3d 843, 846 (9th Cir. 2003), <u>abrogated on other grounds as recognized in</u> <u>South Ferry, L.P., No. 2 v. Killinger</u>, 542 F.3d 776, 782-84 (9th Cir. 2008).

Plaintiffs contend that after making the alleged misrepresentations during the subject conference calls and/or in the press releases in 2010, Defendants later "admitted" that they knew that Cisco's revenues, margins and market share would decline. <u>See</u> Pls.' Opp'n at 7-8. In particular, Plaintiffs point to statements by Chambers on February 9, 2011, February 15, 2011, February 23, 2011, and April 7, 2011 in which he allegedly admitted knowing that the margins on new products would be lower and therefore sales volume would need to increase to generate the same amount of revenue. <u>See id.</u> at 8 (citing Am. Compl. ¶¶ 100, 101, 106-110). However, Chambers' statements in 2011 can hardly be described as "admissions." To the contrary, Chambers simply recognized that Cisco had never launched so new many new products at once, and that the margins on new products typically start lower and take time to increase. <u>See</u> Am. Compl. ¶¶ 101-103, 105, 106. While Chambers' statements offer an explanation for Cisco's disappointing financial performance, they do not support the conclusion or provide a strong inference that Chambers knew his statements in 2010 were false or misleading when made.

Moreover, Plaintiffs ignore that Cisco's SEC filings during the Class Period disclosed that the introduction of new products may adversely impact Cisco's margins and revenue. <u>See</u> RJN Ex. C at 54. In its Form 10-Q quarterly report filed with the SEC on February 17, 2010, Cisco disclosed that "[p]roduct gross margin may be adversely affected in the future by changes in the mix of products sold; including further periods of increased

growth in some of our lower margin products; introduction of new products, including products with price performance advantages; our ability to reduce production costs; entry in to new markets, including markets with different pricing structures and cost structures; . . ." Id.  Likewise, during the August 10, 2010 conference call, Chambers disclosed to analysts that "we always start with lower gross margins on the new products" compared to "established products."  RJN Ex. M at 15.  He added that such impact "is going to be with us for a little while."  Id.

Calderoni also publicly disclosed during the February 3, 2010 and May 12, 2010 conference calls that Cisco's introduction of new products in tandem with market and competition issues in consumer products and discounts offered in both sectors would affect margins and revenues.  See, e.g., Am. Compl. ¶¶ 222 ("[t]he decrease [in margins] was primarily due to higher discounts . . . .we do recognize the variability in product mix and other factors that will impact the gross margin."); id. ¶ 237 ("The remainder of the decrease in product margins was driven by pricing and higher discounts"); RJN Ex. K at 6 ("we recognize that variability in product mix and other factors will impact gross margins" and "[w]e saw variability in our margins across the theaters due to unfavorable mix and discounting"); id. Ex. S at 5 (May 12, 2010 press release stating that "product costs or mix of products sold" and "increased competition in our product and service market" as risks and uncertainties).[5]

At bottom, the Court finds that the "after the fact" statements cited by Plaintiffs are insufficient to establish a strong inference of scienter.  Despite Plaintiffs' assertions to the contrary, Defendants did not make any "admissions" or statements that contradicted or were inconsistent with their prior statements during conference calls or in press releases.

_____

[5] Citing In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248 (N.D. Cal. 2000), Plaintiffs argue that "negative analyst reactions" are sufficient to show scienter. See Pls.' Opp'n at 9.  McKesson merely recognized the relevance of investigative reporting by the media to scienter; it did not involve analyst reactions to company performance.  Id. at 1272.  In any event, none of the analyst reports cited by Plaintiffs in their Complaint identify any contradictory or inconsistent information available to Defendants at the time of their earlier, allegedly misleading statements.

At most, Defendants' statements are akin to "[h]onest optimism followed by disappointment," as opposed to "lying or misleading with deliberate recklessness." Ronconi, 253 F.3d at 432.

### c)       Close Relationship with Customers

The Amended Complaint alleges that an inference of scienter can be drawn from Cisco's close relationship with its customers.  See Am. Compl. ¶¶ 13, 179-190, 245, 251. These allegations are too conclusory to show scienter.  In re Splash, 160 F. Supp. 2d at 1079 (bare allegation that managers were in "constant contact" with customers and had "direct access" to information from them was insufficient to infer scienter).  Tellingly, Plaintiff does not address this issue in their opposition brief.

### d)       Internal Statements and Information

Plaintiffs identify seven confidential witnesses, all former employees of Cisco, who allegedly support the conclusion that the Defendants' optimistic statements were, in fact, knowingly false.  See Am. Compl. ¶¶ 40-47.  A complaint relying on statements from confidential witnesses to establish scienter must pass two hurdles to satisfy the PSLRA pleading requirements: (1) "the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge"; and (2) the statements "[that] are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  Zucco Partners, 552 F.3d at 995.

Plaintiffs rely on confidential witness statements to show, inter alia, that Defendants were aware that Cisco was facing a litany of issues, including problems in the consumer segment, loss of market share, increased pressure from competitors and "channel stuffing" (i.e., offering discounts to increase sales volume, but at the expense of sale in future sales). See, e.g., Am. Compl. ¶¶ 111-113, 115 129-134, 161-69; Pls.' Opp'n at 8-13.  Yet, there are no facts alleging that any of the confidential witnesses had direct contact with either Chambers or Calderoni.  Consequently, the statements of the confidential witnesses are insufficient to establish a strong inference of scienter.  In re Am. Apparel, Inc. Shareholder

1   Litig., No. CV 10-06352 MMM (JCGx), 2013 WL 174119, *19 (C.D. Cal., Jan. 16, 2013)

2   (finding that statements from confidential witnesses did not demonstrate scienter in the

3   absence of facts showing that the adverse information was communicated to company

4   executives); Szymborski v. Ormat Techs., Inc., 776 F. Supp. 2d 1191, 1201 (D. Nev. 2011)

5   (finding that statements by confidential witnesses who were not alleged to have had any

6   contact with company management or the individual defendants did not present "a cogent

7   and compelling inference of scienter.") (citing Zucco Partners, 552 F.3d at 999).

8        Apparently recognizing the dearth of contact between the confidential witnesses and

9   Defendants, Plaintiffs imply that Chambers and Calderoni must have known about Cisco's

10  inability to attain its revenue targets.  For example, Plaintiffs allege that "CW1," a

11  marketing manager in Cisco's Consumer Product division from August 2006 to February

12  2011, confirmed that in early 2010, Cisco was experiencing poor sales of its routers, which,

13  in turn, led to revised revenue targets.  See Am. Compl. ¶¶ 130-136.[6]  Plaintiffs insinuate

14  that Chambers and Calderoni knew about the reduced consumer revenue targets in the

15  Spring of 2010 because CW1 explained that "revenue targets could not be adjusted

16  unilaterally but had to be approved by Cisco's senior executives."  See id. ¶ 138.  Neither

17  the identity of these "senior executives" nor their relationship to Chambers or Calderoni is

18  disclosed.  Further, the import of the aforementioned allegations is unclear, as Plaintiffs fail

19  to identify any particular statement by Chambers or Calderoni that is inconsistent with

20  CW1's assertions.  That aside, there is no factual foundation for CW1's statements.  See In

21  re Daou Sys., 411 F.3d at 1015 (noting that with regard to confidential witness statements,

22  "this circuit does strictly adhere to the PSLRA's mandate that the complaint 'state with

23  particularity all facts on which [a] belief is formed,' and in so doing, requires that a plaintiff

24  reveal 'the sources of her information.'") (quoting in part In re Silicon Graphics Inc. Sec.

25  Litig., 183 F.3d 970, 985 (9th Cir. 1999)).

26

27

28        _____

        [6] In terms of reporting structure, CW1 was four levels removed from Chambers.  Id.

The allegations of other confidential witnesses fare no better.  Plaintiffs point to statements by CW2, a former business and development manager in Cisco's service provider unit, that customers preferred high-end switches and routers manufactured by Cisco's competitors, which, in turn, resulted in lost market shares and downward pricing pressure.  See Pls.' Opp'n at 8-9; Am. Compl. ¶¶ 42, 111-13, 115-16.  However, the comments by CW2 do not support any such inference of scienter for three reasons.  First, CW2 did not work at Cisco during the Class Period, as she or he was laid off in 2009. Zucco Partners, 552 F.3d at 996 (discounting confidential witness who was not at the company during the relevant period).  Second, CW2 does not identify any specific, inconsistent report or information that was reviewed by Defendants before they made their public statements.  Third, CW2 does not provide any details regarding which competitors offered superior products at lower prices at the time Defendants made their statements. Copperstone v. TCSI Corp., No. C 97-3495 SBA, 1999 WL 33295869, *10 (N.D. Cal. Jan. 19, 1999) (rejecting scienter related to competition without these types of specific facts).

Finally, Plaintiffs cite statements by five other confidential witnesses (CW3-CW7) that Cisco concealed the combined challenges of increased competition and declining demand for its cable set-top boxes by offering "huge discounts to pull in orders from future quarters."  See Pls.' Opp'n at 11; Am. Compl. ¶¶ 161-168.  However, the statements offered by Plaintiffs are highly general in nature, and lack any specific details of these alleged transactions, such as the customers involved, the volumes at issue, the discounts given, and so on.  See Copperstone, 1999 WL 33295869, *11 (finding allegation that defendant improperly recognized service and license fee revenue was lacking in specificity regarding the transactions at issue).  For all these reasons, the Court finds that the confidential witness statements cited by Plaintiffs are insufficient to generate a strong inference of scienter.

### 4.    Non-Actionable Statements

Defendants next contend that "[t]he vast majority of the more than 100 alleged statements" on which the Amended Complaint is based fall into categories that are not

1    actionable, as a matter of law.  See Defs.' Mot. at 20.  According to Defendants, these

2    statements may be categorized as:  (1) vague expressions of optimism; (2) forward-looking

3    statements; and (3) omissions as to which the allegedly omitted information already had

4    been disclosed by law.  Id.[7]

5                    a)    *Vague Statements of Optimism*

6         The Ninth Circuit has recognized that "vague statements of optimism" are not

7    actionable.  In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing

8    corporations, however, investors do not rely on vague statements of optimism like 'good,'

9    'well-regarded,' or other feel good monikers."); Glen Holly Ent.'t, Inc. v. Tektronix, Inc.,

10   352 F.3d 367, 379 (9th Cir. 2003) ("The statements were generalized, vague and unspecific

11   assertions, constituting mere 'puffery' upon which a reasonable consumer could not rely").

12   "The defining question is whether . . . the statement is so 'exaggerated' or 'vague' that no

13   reasonable investor would rely on it when considering the total mix of available

14   information."  In re Splash, 160 F. Supp. 2d at 1076-77 (statements using words such

15   "healthy," "strong," robust," "well positioned," "solid," and "improved" were vague and

16   non-actionable "hyperbolic statements").

17        Defendants argue that "[m]ore than half of the statements quoted in the [Amended

18   Complaint] constitute non-actionable vague expressions of optimism."  See Defs.' Mot. at

19   21.  By way of example, Defendants highlight references to statements regarding Cisco:

20   i.e., "extremely well positioned"; "strong foundation"; "high probability of gaining market

21   share"; "hitting on all cylinders," "exceeding . . . expectations"; "probably the strongest

22   quarter in history"; "on fire in terms of our growth"; and "compelling financial model."

23   Id.; Am. Compl. ¶ 66, 68, 68, 72, 129, 216, 217, 222, 236, 338, 229.  Courts have found

24   these types of statements to be "corporate puffery" on which no reasonable investor would

25   rely.  See In re Wet Seal, Inc. Sec. Litig., 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007)

26   (noting that statements such as "we're the leader in a rapidly growing market," "we have an

27   _____

28   [7] The Court focuses its analysis only on those paragraphs of the Complaint in which
     the statements are specifically alleged to be false or misleading.

extremely broad product line," "we already have a sizable lead over our competition," and "well-positioned" are non-actionable, vague statements of optimism) (citing cases); Cornerstone, 355 F. Supp. 2d at 1087 (finding defendant's "claims of 'industry leading' growth, growth that 'positions us beautifully,' 'measurable progress,' 'continuing improvements,' 'accomplishments we have achieved,' expressions of pride in [our] staff, 'outstanding retail results,' and other similar comments all constitute vague, unspecific assertions of corporate optimism").

Plaintiffs counter that the Defendants' statements must be evaluated in context. To that end, they attempt to make much of Chambers' claim that the Company was "hitting on all cylinders" as reinforcing the "false impression" that Cisco's expansion strategy was working effectively. See Pls.' Opp'n at 23; Am. Compl. ¶¶ 72, 216, 217. It is true that "optimistic statements, when taken in context, might constitute a basis for a claim under section 10(b) and rule 10b-5." Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996). But, in this instance, the context of Chambers' statement does not help Plaintiffs. During the February 3, 2010 conference call, Chambers was asked by an analyst why he felt confident about the Company's then current strategy. RJN Ex. K at 12. In response, Chambers offered a lengthy, albeit flowery, explanation about why he felt positive about recovering from the effects of the economic recession. Id. He cited increased confidence by leaders around the world, more effective coordination of Cisco's products and improved relationships with its service providers. Id. He concluded his answer by stating: "So long-winded answer to your question. What we can control or influence. We are hitting on all cylinders, and the market overall feels very solid. And I see this across government and business leaders around the world." Id. (emphasis added). It is thus clear from the context in which Chambers made his "hitting on all cylinders" remark that is was nothing more than a vague expression of optimism.

### b)   *Forward-Looking Statements*

Defendants contend that a "laundry list" of statements alleged in the Amended Complaint which form the basis of Plaintiffs' claims are non-actionable, forward-looking

1  statements.  See Defs.' Mot. at 22.  The PSLRA provides "a safe harbor for forward-

2  looking statements identified as such, which are accompanied by meaningful cautionary

3  statements."  Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox

4  Co., 353 F.3d 1125, 1132 (9th Cir. 2004). "A 'forwardlooking statement' is any statement

5  regarding (1) financial projections, (2) plans and objectives of management for future

6  operations, (3) future economic performance, or (4) the assumptions 'underlying or related

7  to' any of these issues."  No. 84 Employer-Teamster Joint Council Pension Trust Fund v.

8  America West Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003).

9  "[I]f a forwardlooking statement is identified as such and accompanied by

10  meaningful cautionary statements, then the state of mind of the individual making the

11  statement is irrelevant, and the statement is not actionable regardless of the plaintiff's

12  showing of scienter."  In re Cutera, 610 F.3d at 1112.  A meaningful cautionary statement

13  "does not require a listing of all factors that might make the results different from those

14  forecasted.  Instead, the warning must only mention important factors of similar

15  significance to those actually realized."  In re Copper Mountain Sec. Litig., 311 F. Supp. 2d

16  857, 882 (N.D. Cal. 2004) (emphasis in original).  Alternatively, if a forward-looking

17  statement is not identified as such or is unaccompanied by meaningful cautionary

18  statements, then the statement is actionable only if the plaintiffs allege that the forward-

19  looking statement "was made with actual knowledge by that person that the statement was

20  false or misleading."  15 U.S.C. § 78u-5(c)(1)(B); see Provenz v. Miller, 102 F.3d 1478,

21  1487 (9th Cir. 1996).  Whether a statement qualifies for safe harbor protection may be

22  adjudicated on a motion to dismiss.  15 U.S.C § 78u-5(e).

23  In their opposition, Plaintiffs state that forward-looking statements are alleged in

24  Paragraphs 223, 243 and 264 of the Amended Complaint.  See Pls.' Opp'n at 24.

25  Paragraph 223 alleges that during the May 10, 2010 conference call, Calderoni made the

26  following statement:

27          Let me now give you some additional details on the Q4
                financial guidance. As we have said in the past, forecasting
28          gross margin has always been challenging due to various factors

> such as volume, product mix, variable component costs,
> customer and channel mix and competitive pricing pressures.
> That being said, <u>we believe total gross margin in Q4 will be
> approximately 64% to 65%, reflecting the revenue guidance I
> just shared with you</u>.

Am. Compl. ¶ 223 (emphasis added, original emphasis omitted).[8]  The highlighted

statement is forward-looking because it contains a prediction of future economic

performance.  Though not disclosed in the Amended Complaint, the transcript from the

conference call reveals that Calderoni prefaced his statement by noting that his "comments

include forward-looking statements."  RJN Ex. M at 11.  As such, Calderoni's statements

sufficiently identify his statements as forward-looking.  <u>In re Cutera</u>, 610 F.3d at 1112

(citing similar statements at the beginning of a conference call as adequate to identify

statements later in the call as forward-looking).

Calderoni also acknowledged that Cisco's margins were negatively impacted by

"higher discounts," "competitive pricing pressures" and "variability in the product mix."

<u>See</u> Am. Compl. ¶ 222.  Calderoni added that "forecasting gross margin has always been

challenging due to various factors such as volume, product mix, variable component costs,

customer and channel mix and competitive pricing pressures."  <u>See id.</u> ¶ 223.  These

warnings relate specifically to the various types of information that Plaintiffs allege

Defendants withheld from the market.  As such, in light of these warnings, the Court finds

that Calderoni's statement regarding future performance qualifies for the safe harbor, as it

was identified as forward-looking and it contains a meaningful cautionary statement.

Paragraph 243, which pertains to a statement by Chambers during the August 11,

2010 conference call, alleges as follows:

> [I]f there is one key takeaway from this call that I would like for
> you all to think about, our strategy and vision is absolutely
> working. We are gaining [market share].  We are gaining
> product leadership. We are gaining architecture.  Our
> relationships with our customers is moving from being a box

---

[8] Plaintiffs fail to identify which particular aspect of Paragraphs 223, 243 and 264 qualifies as a forward looking statement.  Therefore, the Court independently reviews each paragraph to conduct to an appropriate analysis in connection with Defendants' motion to dismiss.

player or a router or a switcher – switching to really a key business partner, a trusted technical advisor. We will win more than our fair share of jumpballs in all areas.  And it is unusual a company can say that with that type of confidence.  We are clearly applying in terms of our growth projections for the future very comfortable and becoming more comfortable with our long-range 12% to 17%.

So I think it is important when you think out, several years out, 12% to 17%, most of the shareholders would be very, very comfortable with. We are saying when you start comparing quarters where we have had very good growth to quarters where we have very good growth, we are very pleased that we are at the high end of that or above that.

So that is perhaps my one key takeaway.  Things we control or influence are in great shape.  Our growth in terms of our long-term aspirations looks very good, and we are playing actually at the high end or above on that. And our concerns are normal cautious concerns, which you would expect to see . . . .

Am. Compl. ¶ 243 (emphasis added, original emphasis omitted).

Chambers' comment that he was looking for a future growth rate of 12% to 17% ostensibly is a forward-looking statement, as it relates to future economic performance. During the conference call, Chambers prefaced his statements as including forward-looking statements, RJN Ex. M at 3, and warned that Cisco could be affected by changes in spending patterns, new and existing competitors and an inability to execute on its strategy, among other things, see id. at 6.  In addition, Chambers acknowledged that profit margins had suffered due to "an unfavorable mix impact driven by numerous recent [product] introductions, along with "pricing and higher discounts." See id. at 7 (emphasis added). These warnings suffice to trigger safe harbor protection.

The statement in Paragraph 264 was made Calderoni during the November 10, 2010 conference call.  In response to a question from an analyst about "gross margin guidance," Defendant Calderoni stated:

As far as the gross margin is concerned, we have in the near term probably two factors that would affect gross margins. First, as you would expect with the guidance that we gave on revenue volume.  So as volume comes down that has a negative impact on margin.

And then the other thing as it relates to Q2, which I think is important, is the seasonality of some of our businesses like consumer. Consumer tends to have a very high participation based on the holidays in the second quarter. And as you know, the margin for consumer is lower. So that mix does have a negative impact. So those are two factors to take into consideration for Q2 from a gross margin perspective.

But barring this from a longer-term perspective, let's say for the rest of the year, we see margins in that 64% range, similar to what I had provided last quarter.

RJN Ex. N at 14 (emphasis added).  The highlighted text is forward-looking, as it forecasts future economic performance.  Like the other conference calls, the November 10, 2010 conference call was prefaced with the statement that some statements would be forward-looking.  Id. at 3.  Additionally, Calderoni explained that his statements about guidance would contain forward-looking statements.  Id. at 10.  Thus, the statement is properly characterized as forward-looking.  In addition, the statement was preceded by meaningful, cautionary statements.  The paragraphs prior to the forward-looking statement contain cautionary statements regarding the negative effects from sales volume and seasonality on gross margins.  Accordingly, the statement at issue qualifies for the safe harbor.

The Court finds that all of the statements addressed above qualify for the safe harbor provision of 15 U.S.C. § 78u–5(c)(1).

### c)   *Previously Disclosed*

Defendants argue that some of Plaintiffs' claims are based on omissions that, in fact, were disclosed as a matter of public record.  See Defs.' Mot. at 24-25.  Though not characterized as such, Defendants' argument appears to be based upon "truth-on-the-market" doctrine.  Under this theory, a defendant's failure to disclose material information may be excused where the information was made credibly available to the market by other sources.  Basic Inc. v. Levinson, 485 U.S. 224, 248-49 (1988).  However, it is questionable whether a truth-on-the-market defense is available at the pleadings stage.  In re Thoratec Corp. Sec. Litig., No. C 04-3168 RMW, 2006 WL 1305226, *4 (N.D. Cal. May 11, 2006) ("'a 'truth-on-the-market' defense is available in principle . . . but not at the pleading

1   stage'") (quoting Asher v. Baxter Int'l Inc., 377 F.3d 727, 734 (7th Cir. 2004)); c.f.,

2   Provenz, 102 F.3d at 1492-93 (resolving truth-on-the-market issue on summary judgment).

3   In any event, since the Amended Complaint is subject to dismissal for the reasons discussed

4   in other sections of this Order, the Court need not address Defendants' contentions

5   regarding whether certain of Plaintiffs' claims are barred by the truth-on-the-market

6   doctrine.

7   **B.   CLAIM UNDER § 20(A) OF THE EXCHANGE ACT**

8   Finally, Defendants challenge Plaintiffs' second cause of action under § 20(a) of the

9   Exchange Act, which provides that joint and several liability may be imposed on persons

10  who directly or indirectly control a violator of the securities laws.  15 U.S.C. § 78t(a).  To

11  establish "control person" liability under § 20(a) of the Exchange Act, Plaintiffs must show

12  that a primary violation of § 10(b) or Rule 10b-5 was committed and that each individual

13  defendant "directly or indirectly" controlled the violator.  Paracor Fin., Inc. v. Gen. Elec.

14  Capital, 96 F.3d 1151, 1161 (9th Cir. 1996).  Since Plaintiffs have failed to state a viable

15  § 10(b) claim, Plaintiffs' claim under § 20(a) of the Exchange Act necessarily fails.

16  **C.   LEAVE TO AMEND**

17  "Dismissal with prejudice and without leave to amend is not appropriate unless it is

18  clear . . . that the complaint could not be saved by amendment."  Eminence Capital, LLC v.

19  Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003).  Although the deficiencies in the

20  Amended Complaint are significant, it certainly is possible that Plaintiffs will be able to

21  rectify them if provided the opportunity to do so.  In addition to pleading falsity and

22  scienter with the requisite particularity, Plaintiffs should consider eliminating repetitive

23  allegations as well as superfluous and sensationalized averments that have little, if any,

24  bearing on stating a claim against Defendants.

25  //

26  //

27  //

28

V.    **CONCLUSION**

IT IS HEREBY ORDERED THAT:

1.    Defendants' Motion to Dismiss the First Amended Complaint is GRANTED. Plaintiffs shall have until April 26, 2013 to file a Second Amended Complaint, consistent with the Court's rulings.  Plaintiffs are advised that any additional factual allegations set forth in their amended complaint must be made in good faith and consistent with Rule 11.

2.    The parties shall appear for a telephonic Case Management Conference on **June 19, 2013 at 2:30 p.m.**  Prior to the date scheduled for the conference, the parties shall meet and confer and prepare a joint Case Management Conference Statement which complies with the Standing Order for All Judges of the Northern District of California and the Standing Orders of this Court.  Plaintiffs shall assume responsibility for filing the joint statement no less than seven (7) days prior to the conference date.  Plaintiffs' counsel is to set up the conference call with all the parties on the line and call chambers at (510) 637-3559.  NO PARTY SHALL CONTACT CHAMBERS DIRECTLY WITHOUT PRIOR AUTHORIZATION OF THE COURT.

3.    This Order terminates Docket 65.

IT IS SO ORDERED.

Dated: March 29, 2013

SAUNDRA BROWN ARMSTRONG
United States District Judge